UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>SHAUN GRAGORY MITCHELL,<br><br>Defendant. | 4:24-CR-40008-KES<br><br>ORDER ADOPTING REPORT &<br>RECOMMENDATION AS MODIFIED<br>AND SUPPLEMENTED AND DENYING<br>MOTION TO SUPPRESS |

Defendant, Shaun Gragory Mitchell, is charged with one count of conspiracy to distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Docket 1. Mitchell moves to suppress all evidence obtained by law enforcement pursuant to five search warrants.[1] Docket 88. Invoking *Franks v. Delaware*, 438 U.S. 154 (1978), Mitchell contends that the warrants are invalid because officers deliberately or recklessly omitted information from their affidavits that was material to the judge's probable cause determination. *Id.* at 1-2; Docket 92 at 10-14. Mitchell argues that, had the omitted facts been included, the warrants would have lacked probable

---

[1] As the magistrate judge observed, Mitchell does not challenge the pen register/trap & trace (PRTT) order or the unexecuted South Dakota tracking warrant, and the United States does not seek to introduce evidence from the search of Mitchell's home in Minnesota. Docket 113 at 2. Thus, Mitchell's suppression motion and the magistrate judge's report concern only five warrants, discussed in more detail below. *See* Dockets 92-1, 92-4, 92-5, 92-6, and 92-7.

cause to justify the searches. Docket 88 at 1; Docket 92 at 14-18. Mitchell also argues that, because the first warrant fails, the rest follow as fruit of the poisonous tree. Docket 88 at 1; Docket 92 at 18-19. On that basis, Mitchell maintains that all evidence obtained from the searches must be suppressed. Docket 88 at 1-2; Docket 92 at 19.

The court referred Mitchell's motion to suppress to Magistrate Judge Veronica L. Duffy under 28 U.S.C. § 636(b)(1)(B). After holding a *Franks* hearing, Docket 104, Magistrate Judge Duffy recommended denying Mitchell's motion to suppress, Docket 113 at 56. Mitchell filed objections to the Report and Recommendation, Docket 118, and the United States responded to those objections, Docket 124. After a de novo review of the Report and Recommendation and the record, the court adopts the Report and Recommendation as modified and supplemented below and denies Mitchell's motion to suppress.

## LEGAL STANDARDS

This court's review of a magistrate judge's report and recommendation is governed by 28 U.S.C. § 636 and Rule 59 of the Federal Rules of Criminal Procedure. The court reviews de novo any objections to the magistrate judge's recommendations with respect to dispositive matters that are timely made and specific. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b). Because motions to suppress evidence are considered dispositive matters, a magistrate judge's recommendation regarding such a motion is subject to de novo review. 28 U.S.C. § 636(b)(1); *see also United States v. Raddatz*, 447 U.S. 667, 673 (1980).

2

In conducting a de novo review, this court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also United States v. Craft*, 30 F.3d 1044, 1045 (8th Cir. 1994).

## FACTS

After conducting a de novo review of the evidentiary hearing transcript and admitted exhibits, the court first sets out the facts as developed at the *Franks* hearing. It then turns to the facts included in the relevant search warrants.[2]

## I.    Testimony from the Hearing

On January 8, 2026, the magistrate court held a *Franks* hearing where two witnesses testified. Docket 104. The United States first called Special Agent Ryan Pennock from the South Dakota Division of Criminal Investigation (DCI) to testify. Docket 110 at 6-7. The following factual account is drawn from his hearing testimony:

On June 29, 2023, a young woman, "K," died in Yankton, South Dakota, due to a fentanyl overdose. *Id.* at 8-9. On July 13, 2023, after the autopsy confirmed fentanyl poisoning as K's cause of death, Pennock became involved in the investigation. *Id.* at 8, 10. Pennock contacted a former confidential informant (CI) to determine whether they had information regarding K's

---

[2] The court refers to the exhibit numbers in the same manner as described by the magistrate judge in her report. *See* Docket 113 at 3 ("[T]he court will refer to the exhibit number assigned by defendant in his brief.").

overdose. *Id.* at 9. The CI reported that K's mother, "J," had been discussing K's death and identified "D" as the source of the fentanyl.[3] *Id.* at 9-10. J also indicated that D had previously traveled to Sioux Falls, South Dakota, to purchase fentanyl. *Id.* At Pennock's request, the CI conducted two controlled purchases of fentanyl from D. *Id.* at 10-11. One transaction took place at a park in Yankton, *id.* at 10, and the other occurred at D's residence, where D's children were present, *id.* at 11. During the transaction, which was recorded by law enforcement, D remarked that their children were a "terror." *Id.*

After the controlled buys, Pennock applied for and obtained a search warrant in early August 2023 to install a tracking device on D's vehicle. *Id.* at 12. On August 19, 2023, Pennock observed activity consistent with a possible drug purchase and initiated a traffic stop. *Id.* at 12-13. Although no narcotics were recovered, Pennock interviewed D and removed the tracking device in D's presence to make clear that D was under investigation. *Id.* at 13-14, 16.

Approximately five years before the August 19, 2023, interview, Pennock encountered D during a traffic stop arising from an unrelated drug investigation. *Id.* at 16-18. At that time, D possessed a straw commonly associated with drug ingestion. *Id.* at 16-17. D provided law enforcement with information that led to another individual's prosecution. *Id.* at 17. Pennock

---

[3] As the magistrate judge noted, the court uses the pronouns "they/them" throughout this opinion to obscure the gender of D and CI 6. *See* Docket 113 at 5 n.3.

could not recall whether D was ultimately charged with possession of drug paraphernalia. *Id.* at 17-18.

During the August 19, 2023, interview, Pennock informed D that law enforcement had conducted two controlled purchases from them. *Id.* at 14. Pennock advised D that they faced potential felony charges, including possession and distribution of a controlled substance, child endangerment, maintaining a premises for the sale or use of a controlled substance, and distribution in a school zone. *Id.* He also reminded D that their prior cooperation in the matter five years ago had a positive outcome for D. *Id.* at 17.

Pennock and D discussed whether D's cooperation would result in any benefit to D. *Id.* at 18. Pennock told D that any consideration would depend on the information D provided to law enforcement and that the ultimate decision was out of his hands. *Id.* D then admitted to selling fentanyl and identified suppliers, including an individual known as "Shaun." *Id.* at 19. D described Shaun as a heavy set African American man with gold or silver teeth who drove a dark or silver Suburban that had black wheels and Minnesota license plates. *Id.* at 19-20.

D provided Pennock with Mitchell's cell phone number, beginning with a (218) area code, and described the process for arranging purchases of fentanyl pills. *Id.* D stated that they were first introduced to Mitchell through Jordan Reese. *Id.* at 20. D also stated that Mitchell, his brother—later identified as William Wilson, *id.* at 21—or his nephew (Wilson's son) would answer the

phone, and an exchange would be made,[4] *id.* at 19, 21. D described Wilson as a fit, bald African American male who drove a white BMW, and Mitchell's nephew as a skinnier male with dreadlocks. *Id.* at 19. D estimated making between 40 and 50 purchases from Mitchell and his associates and further estimated that approximately 10 purchases were made from Wilson and 10 were made from Mitchell's nephew. *Id.* at 20-21. Pennock testified that D's most recent fentanyl purchase from Mitchell occurred on August 18, 2023—the Friday prior to D's traffic stop. *Id.* at 25. On August 19, 2023, Pennock seized D's cell phone to prevent tampering. *Id.* at 23.

On August 22, 2023, Pennock interviewed D again and obtained consent to search their phone. *Id.* at 24. D disclosed further details regarding prior drug activity, including a trip to Sioux Falls with K's mother, J, to purchase the fentanyl that resulted in K's death. *Id.* at 26. D stated that J provided money for pills, which D supplemented with personal funds to purchase fentanyl from Mitchell or one of his associates. *Id.* at 26-27. D left J in the vehicle during the transaction and, upon returning, gave J the pills that were later provided to K. *Id.* D stated that similar trips had occurred previously. *Id.* at 27.

On August 23, 2023, Pennock met with D to formalize D's role as a CI after receiving authorization from the Yankton County State's Attorney and a DCI supervisor. *Id.* at 29-30, 99. Pennock testified that the State's Attorney indicated D could still face imprisonment despite cooperation. *Id.* at 29. A

---

[4] The court hereinafter refers to Wilson and his son (Mitchell's nephew) as Mitchell's "associates."

criminal history check revealed D had two prior misdemeanor DUI convictions. *Id.* at 30-31. D was ultimately designated as DCI Confidential Informant 23-3446 (hereinafter "CI 6"). *See, e.g.*, Docket 92-1 at 10. As part of the CI intake process, CI 6 completed a Confidential Informant/Personal History form, stating that the motivation for cooperation was the possibility of reduced charges related to fentanyl distribution. Docket 107 at 6; Docket 110 at 32.

CI 6 reported making nearly daily fentanyl purchases from Mitchell and his associates and indicated that it would appear unusual if a purchase were not made soon. Docket 110 at 32. A controlled purchase was arranged that same day—40 fentanyl pills for $400; Mitchell's brother, Wilson, conducted the sale. *Id.* at 33. A second controlled purchase with Wilson occurred on August 24, 2023. *Id.* at 35.

On August 30, 2023, Pennock interviewed J, who confirmed that D purchased fentanyl from Mitchell in Sioux Falls. *Id.* at 52. In subsequent search warrant applications, Pennock stated that he omitted certain details about CI 6 to protect the informant's identity. *Id.* He did not disclose CI 6's involvement in K's overdose, CI 6's own distribution activities, CI 6's expectation of leniency on felony charges, or CI 6's criminal history. *Id.* at 50-52, 108-09, 115.

When asked why those details were not included in his affidavits, Pennock testified that he included what he believed was necessary to establish probable cause for the specific searches sought. *Id.* at 51. He further explained

7

that, because the CI's identity was confidential, he avoided including specific identifying information, such as dates of arrest. *Id.* at 51-52.

Special Agent in Charge Dan Louwagie of the Minnesota Bureau of Criminal Apprehension also testified at the evidentiary hearing. *Id.* at 148-49. Louwagie testified that he became involved on September 7, 2023, when Pennock requested assistance investigating Mitchell for fentanyl distribution. *Id.* at 151. Mitchell resided in Luverne, Minnesota, within Louwagie's jurisdiction. *Id.* at 46-47. Prior to that request, Mitchell was not under investigation in Minnesota. *Id.* at 159.

At the outset of his investigation, Louwagie and another agent conducted periodic surveillance of Mitchell's residence in Luverne. *Id.* at 151-52. During that time, they confirmed that Mitchell resided at the address provided by Pennock and identified the vehicles he was observed driving. *Id.* at 152, 155.

Approximately four to six weeks later, Pennock asked Louwagie to seek tracking device warrants for Mitchell's vehicles from a Minnesota judge. *Id.* at 152. Louwagie relied on information provided by Pennock in preparing his affidavits, because he had no independent knowledge of CI 6. *Id.* at 152-53. Pennock supplied the probable cause section of one of his South Dakota affidavits for Louwagie's use in the Minnesota applications. *Id.* at 153. Louwagie testified that he was aware of CI 6's existence but had no knowledge of CI 6's background or criminal history, explaining that he relied on interagency trust in working with Pennock's investigation. *Id.* at 154, 160, 163.

8

Louwagie also testified that, in the affidavits he prepared, he included facts derived from his own investigation of Mitchell's residence in Luverne. *Id.* at 154. He did not include verbatim text messages from D's phone, concluding that they were unnecessary to establish probable cause. *Id.* at 153-54. This investigation marked Louwagie's first direct collaboration with Pennock, although they may have been involved in other investigations previously. *Id.* at 168.

The warrants at issue for which Louwagie served as affiant are the two Minnesota tracking device warrants. *See* Docket 92-4; Docket 92-5. After the warrants were issued, Louwagie testified that he and Pennock traveled to Mitchell's residence in Luverne. Docket 110 at 156. Louwagie stated that he believed he personally installed the tracking devices on Mitchell's Charger and Suburban while Pennock observed. *Id.* at 163-64.

Following installation of the devices, Louwagie and other Minnesota agents conducted additional physical surveillance of Mitchell. *Id.* at 156-57, 164. On several occasions, when Mitchell departed Luverne, Minnesota agents followed him to Sioux Falls. *Id.* at 157. On November 28, 2023, Minnesota agents coordinated with South Dakota agents to conduct surveillance of Mitchell in Sioux Falls for approximately three to four hours. *Id.* During that operation, Louwagie observed Mitchell stop at several hotels and at the Sioux Falls Airport. *Id.* at 157, 165.

The court now turns to the facts set forth in the search warrants that Mitchell challenges.

## II.   The Search Warrants

### A.   Exhibit 1 – October 11, 2023, South Dakota Ping Warrant for the (612) Cell Phone

On October 11, 2023, Pennock applied for and obtained a ping warrant for a cell phone with a (612) area code that he believed was used by Mitchell. *See* Docket 92-1. The warrant authorized law enforcement to receive prospective precision cell site location information from the target phone for a period of 60 days. *Id.* at 2. The following facts are taken from the affidavit submitted in support of that warrant.

On August 19, 2023, Pennock conducted an audio-recorded interview with CI 6 in connection with a fentanyl-related death that had occurred earlier that summer. *Id.* at 10. CI 6 admitted purchasing fentanyl in Sioux Falls, South Dakota and reported that during the preceding five to eight months CI 6 had purchased fentanyl almost daily from three males. *Id.* CI 6 typically purchased between 20 and 80 pills at a time at a price of $10 per pill. *Id.*

CI 6 stated CI 6 knew only one of the male's names, Shaun. *Id.* The phone number used to arrange the purchases began with area code (218). *Id.* CI 6 showed Pennock a Facebook profile for "Shaun MTTM," which Pennock later identified as Mitchell and associated with a likely residence in Luverne, Minnesota. *Id.* at 11. CI 6 reported that Mitchell drove a dark-colored Suburban with Minnesota license plates. *Id.* Investigators later identified the vehicle as likely a 2014 Chevrolet Suburban registered to Mitchell's spouse, Laquita. *Id.*

10

CI 6 further reported that when Mitchell did not answer the phone, another black male would sometimes respond. *Id.* CI 6 described this individual as having a muscular build and a bald head. *Id.* Investigators later identified him as William Wilson, whom Mitchell had identified to CI 6 as his brother. *Id.* CI 6 described a third male as Wilson's son, whom CI 6 described as having a thin build and long dreadlocks. *Id.*

At Pennock's direction, CI 6 arranged a controlled purchase of 40 fentanyl pills using the (218) phone number. *Id.* On August 23, 2023, CI 6 purchased 35 fentanyl pills from Wilson and reported that Wilson appeared to possess more than 1,000 pills during the transaction. *Id.* A second controlled buy was arranged the following day using the same phone number, during which CI 6 purchased 80 fentanyl pills from Wilson. *Id.* at 12.

CI 6 also consented to a forensic examination of CI 6's cell phone. *Id.* That examination revealed text messages between CI 6 and the (218) phone number dating back to June 17, 2023, documenting numerous conversations about the purchase of fentanyl pills. *Id.* The affidavit states that "[i]t is unknown who the CI was actually communicating with in each message, as the phone was utilized by Shaun, Wilson and T3 according to the CI." *Id.* The affidavit further stated that "[f]or documentation purposes, however, messages from [the (218) phone number] will be documented as Shaun (SM)." *Id.* Relevant here, the court provides a summary of those messages.

The messages reflected discussions concerning fentanyl purchases in varying quantities. For example, on July 7, 2023, CI 6 arranged a purchase of

11

90 pills, and the following day purchased another 59. *Id.* at 22-23. On July 10, Mitchell or Wilson wrote that he would not personally conduct the exchange but that his brother would. *Id.* at 24. On July 11, Mitchell or his associates directed CI 6 to make contact using a different phone number with a (605) area code. *Id.*

The messages also indicated that CI 6 was reselling pills to other individuals. For example, on July 6, 2023, CI 6 wrote: "Slow day today lol only need 40 [pills] but I'll prolly do what we talked about and pay ya off tomorrow, Friday is payday for a lot of my people lol." *Id.* at 22.

The messages included discussions about the quality of pills. On August 5, 2023, CI 6 texted the (218) phone number and asked whether certain pills were "different." *Id.* at 30-31. On August 6, CI 6 stated that several individuals who had obtained pills believed the pills "tasted different." *Id.* at 31. On August 12, 2023, CI 6 wrote: "To be honest nobody is a fan of these [pills] nobody wants them so I'm just waiting my money i feel like." *Id.* at 32. Another message stated that CI 6 would continue purchasing pills because "people be getting sick." *Id.* at 33. In another exchange, CI 6 texted the (218) number asking to buy pills at the $10 price "so i can make a little doe." *Id.* at 34.

The forensic examination also revealed numerous text messages between CI 6 and the (605) number that CI 6 had been directed to use, which was controlled by Mitchell or his associates. *Id.* at 35-38. In one message, CI 6 stated: "I'm trying to make a few phone calls so i know how many people[] [a]ctually want so i am not short for these peeps." *Id.* at 35.

12

Investigators also identified text messages between CI 6 and a phone number with a (612) area code—the phone number that was the subject of the ping warrant. *Id.* at 38-40. The affidavit stated that those messages began May 30, 2023, and continued until July 29, 2023. *Id.* at 38. The (612) phone number was associated with a CashApp account linked to Mitchell by name. *Id.*

In those exchanges, CI 6 wrote on May 30, 2023, "[s]o i got like three people asking if i have any for sale." *Id.* In another exchange, Mitchell stated that he was "from Minnesota from the cities but . . . in a small town in South Dakota" approximately 30 minutes north of Sioux Falls. *Id.* at 39. On June 9, 2023, CI 6 stated they needed 45 pills. *Id.* at 40. Another message referenced CI 6 stating that they owed Mitchell $200. *Id.* at 39.

The affidavit also described an attempted traffic stop of Wilson on August 29, 2023, in South Dakota. *Id.* at 40. When an officer asked Wilson to exit the vehicle, Wilson fled at a high rate of speed and was not apprehended. *Id.* CI 6 later reported that they had been unable to contact anyone using the (218) phone number and that Mitchell had blocked CI 6 on Facebook. *Id.* at 41.

The affidavit further stated that on September 11, 2023, Special Agent Dan Louwagie of the Minnesota Bureau of Criminal Apprehension informed Pennock that Minnesota officers had attempted a traffic stop of Wilson near Worthington, Minnesota, the previous day. *Id.* Wilson again attempted to evade police by driving away at a high rate of speed but was ultimately apprehended. *Id.*

13

The vehicle Wilson was driving was registered to Mitchell's spouse, Laquita. *Id.* A search of the vehicle uncovered $6,240 in cash, two baggies of marijuana, a scale that tested positive for cocaine residue, and two iPhones. *Id.* Some of the serial numbers on the seized currency matched the recorded serial numbers of the buy money used by CI 6 during the controlled purchases conducted in August. *Id.* The currency later tested positive for trace amounts of cocaine. *Id.*

**B.     Exhibit 4 – October 24, 2023, Minnesota Tracking Warrant for the Dodge Charger**

On October 24, 2023, Louwagie applied for and obtained a search warrant to place a tracking device on Mitchell's Dodge Charger. Docket 92-4 at 1, 7, 15. The affidavit in support of that warrant included the following information:

Similar to the affidavit submitted in support of the South Dakota Ping Warrant for the (612) phone number, this affidavit recounts the same initial information regarding Pennock's audio-recorded interview with CI 6. *Id.* at 3-4. The affidavit states that CI 6 identified Mitchell, Wilson, and Mitchell's nephew as sources of fentanyl. *Id.* at 3. CI 6 reported purchasing 20 to 80 fentanyl pills from this group nearly every day for the previous five to eight months. *Id.* CI 6 further identified one individual as "Shaun" and referenced Mitchell's Facebook page. *Id.* The affidavit also documents two controlled purchases from Wilson in August 2023. *Id.* at 4.

14

The affidavit noted that seven bills used by CI 6 in the controlled buys were recovered from Wilson following his car chase on September 10, 2023, and that these bills tested positive for trace amounts of cocaine. *Id.* The affidavit did not include the verbatim text messages obtained from CI 6's cell phone but contained additional information obtained since the October 11, 2023, ping warrant. *Id.* at 5-6

Specifically, Minnesota officers conducted surveillance at Mitchell's Luverne residence. *Id.* at 5. They observed him leave in a 2014 silver Chevrolet Suburban with Minnesota plates and followed him to Sioux Falls before ending surveillance. *Id.* The officers later observed Mitchell leave in the Suburban while his spouse left in a dark blue Hyundai Sonata, both vehicles registered to his spouse. *Id.*

The affidavit reported that PRTT results from Mitchell's cell phone showed that he traveled to Sioux Falls on several occasions and also traveled to the Minneapolis, Minnesota area. *Id.* South Dakota officers observed Mitchell driving a dark gray Dodge Charger with black rims and no license plates in Sioux Falls. *Id.* Minnesota officers later observed the same Charger parked at the Luverne residence with a temporary rear license plate in the back window. *Id.*

### C.     Exhibit 5 – October 24, 2023, Minnesota Tracking Warrant for the Suburban

The affidavit in support of this warrant is very similar to the affidavit in support of the tracking warrant for Mitchell's Dodge Charger. *Compare* Docket

15

92-4 at 5 (warrant for the Dodge Charger), *with* Docket 92-5 at 4 (warrant for the Suburban). The only difference is that the affidavit supporting the warrant to track the Suburban does not include information regarding surveillance of Mitchell in Sioux Falls on October 19, 2023, or near his Luverne residence on October 23, 2023. *See* Docket 92-5 at 4.

### D.    Exhibit 6 – November 7, 2023, Cell Cite Simulator for Mitchell's Cell Phone

On November 7, 2023, Pennock applied for and obtained a search warrant authorizing the use of a cell site simulator to identify the cellular device possessed by Mitchell. Docket 92-6 at 1, 3. The affidavit incorporated the same foundational information set forth in the earlier ping-warrant affidavit. *Id.* at 7-9. Unlike the prior affidavit, however, this affidavit summarized—rather than reproduced verbatim—text messages from CI 6's cell phone. The following facts are drawn from the affidavit submitted in support of the warrant.

The affidavit stated that CI 6 purchased fentanyl pills from Mitchell and his relatives using the (218) number from June 17 to August 19, 2023. *Id.* at 9. Although CI 6 did not always specify quantities, the affidavit noted that adding the specified amounts reflected CI 6 requested approximately 2,298 pills over this two-month period. *Id.* Texting the (605) number from June 21 to July 18, 2023, CI 6 ordered an additional 293 pills from Mitchell or his associates. *Id.* Added together, text communications with the (218) and (605) numbers

16

reflected requests totaling roughly 2,500 fentanyl pills from Mitchell or his associates during the period from June 17 to August 19, 2023. *Id.*

The affidavit further stated that CI 6 purchased fentanyl from Mitchell via the (612) number from May 30 through July 29, 2023. *Id.* The affidavit noted that this number was associated with a CashApp account linked to Mitchell, though it did not specify the number of pills purchased using this number. *Id.*

The affidavit also recounted the two traffic stops of Wilson, the discovery of currency partially matching the serial numbers used by CI 6 in the August controlled buys, and the detection of cocaine traces on both the currency and a scale. *Id.* at 10-11.

Additionally, the affidavit described that Pennock had begun receiving location information from the October 11 ping warrant, from PRTT data, and from the Minnesota tracking devices on Mitchell's two vehicles. *Id.* at 11. Physical surveillance was compared to this electronic location data, leading investigators to believe that Mitchell may have been using an unidentified cellular device. *Id.* This warrant therefore sought to identify the unknown device through deployment of a cell site simulator. *Id.*

The cell site simulator was used three times at separate locations while Mitchell was present. Docket 110 at 129. Although no new cellular number was discovered, the warrant confirmed that Mitchell retained possession of the (612) cell phone during all three deployments. *Id.* at 128-29.

17

**E.    Exhibit 7 – December 19, 2023, Search Warrant for Sioux Falls Storage Unit, Dodge Charger, Suburban, and the Person of Shaun Mitchell**

On December 19, 2023, Pennock applied for and obtained a search warrant authorizing the search of a Sioux Falls storage unit, a Dodge Charger, a Chevrolet Suburban, and Mitchell's person. Docket 92-7 at 1-3. The warrant authorized the seizure of items associated with drug trafficking and drug use, as well as firearms. *Id.* at 4-5. The following facts are drawn from the affidavit submitted in support of the warrant.

The affidavit incorporated much of the same background information contained in the earlier ping warrant affidavit, including lengthy verbatim excerpts of text messages recovered from CI 6's cell phone. *Id.* at 7-32. Those messages reflected CI 6's communications with three phone numbers associated with Mitchell and his associates. *Id.* The texts contained multiple indications that CI 6 was purchasing fentanyl pills for redistribution to others, that more than one person appeared to control the (218) number, and that Mitchell was directly linked to the (612) phone number. *Id.*

The affidavit also repeated information concerning the two traffic stops of Wilson, the items recovered from Wilson's possession, and the physical surveillance used to identify Mitchell's residence and vehicles. *Id.* at 33-34.

The affidavit further described information obtained through surveillance of Mitchell. *Id.* at 34-35. Investigators observed Mitchell meet with an individual identified as James Wright on November 8 and 9, 2023. *Id.* at 35.

18

After the November 9 contact, officers stopped Wright and found three fentanyl pills in his possession. *Id.*

Later that day, Pennock and another officer interviewed Wright after advising him of his *Miranda* rights. *Id.* Wright identified as his current fentanyl supplier a person Pennock knew to be Mitchell, although Wright did not know Mitchell's name. *Id.* at 36. Wright also identified Mitchell while Mitchell was driving a Chevrolet Suburban. *Id.* Wright admitted that he purchased fentanyl pills from Mitchell every day for the past week and stated that during his most recent purchase he observed Mitchell in possession of approximately 100 pills. *Id.* Wright further reported seeing Mitchell with large quantities of fentanyl on multiple occasions. *Id.*

On November 30, 2023, CI 6 conducted a controlled purchase of 48 fentanyl pills from Mitchell. *Id.* at 37. During the transaction, Mitchell told CI 6 that he and Wilson were no longer working together and that each was attempting to attract the other's customers. *Id.*

The affidavit also stated that investigators had observed Mitchell visit a storage facility on Ebenezer Avenue in Sioux Falls on multiple occasions. *Id.* Facility management confirmed that Mitchell had rented storage unit #228 on July 30, 2023, remained the listed renter of the unit, and was current on his rental payments. *Id.*

Investigators again surveilled Mitchell on December 13, 2023, when he met with Wright in Sioux Falls. *Id.* at 37-39. Wright entered the passenger seat of Mitchell's Dodge Charger and exited about two minutes later. *Id.* at 39.

19

Officers stopped Wright shortly afterward and found evidence in his vehicle indicating that he had been smoking fentanyl pills. *Id.* Pennock interviewed Wright again, and Wright admitted that he had just purchased fentanyl pills from Mitchell immediately before the traffic stop. *Id.*

Wright reported that he did not see any additional pills in Mitchell's possession during the December 13, 2023, encounter other than the three pills he purchased. *Id.* He stated, however, that about one week earlier he had seen Mitchell with approximately 600 fentanyl pills. *Id.* Wright also reported that Mitchell had recently changed his phone number to a Minnesota number beginning with area code (507). *Id.* at 40. CI 6 later independently reported to Pennock that Mitchell was using a new cell phone number beginning with the same (507) area code. *Id.* After Agents executed the warrant on Mitchell's storage unit on Ebenezer Avenue, investigators located a large quantity of fentanyl pills concealed inside grocery bags placed within an Amazon box. Docket 110 at 79.

## DISCUSSION

Mitchell raises 18 factual objections and 3 legal objections to the Report and Recommendation. *See* Docket 118. The court addresses Mitchell's factual objections before turning to his legal objections.

## I. Factual Objections

### A. Objection 1

Mitchell objects to the magistrate judge's statement that "D estimated they had made 40 to 50 purchases from Mr. Mitchell and his relatives. Of those

purchases, D estimated they had bought 10 times from the brother, 10 times from the nephew, and the remaining times directly from Mr. Mitchell." *Id.* at 2 (quoting Docket 113 at 7). Focusing specifically on the magistrate judge's statement that "the remaining times [they purchased] directly from [him,]" Mitchell contends that the testimony was uncertain and does not support such a statement. *Id.* at 3.

After reviewing the hearing testimony, the court concludes that the magistrate judge's characterization fairly reflects the substance of Pennock's testimony. Docket 110 at 20-21. Pennock testified that D estimated making between 40 and 50 purchases from Mitchell and his associates and attributed approximately 10 purchases each to his brother and nephew. *Id.* Although the total number was expressed as a range, the record reasonably supports the inference that the remaining purchases were made directly from Mitchell. The magistrate judge did not assign a fixed number of purchases to Mitchell but instead described the remainder in general terms consistent with the estimate provided. The court therefore finds that the challenged statement is supported by the record, and the objection is overruled.

### B.    Objection 2

Mitchell objects to the magistrate judge's statement that "D then left J in D's vehicle while D entered Shaun's vehicle to make the purchase." Docket 118 at 3 (quoting Docket 113 at 7). Mitchell argues that Pennock's "testimony does not support the finding that D got in 'Shaun's vehicle.' " *Id.* The court agrees.

21

At the hearing, Pennock testified on direct examination that "[D] described the two of them as traveling up to purchase fentanyl from Shaun or one of his associates. [They] couldn't remember who for sure. [They] said when they arrived, that [they] got out of the vehicle, got in with whichever party it was, made the purchase." Docket 110 at 26. Pennock also testified that D "entered the vehicle with Shaun or his associate." *Id.* at 27. Pennock's testimony reveals that D may have entered "whichever party['s]" vehicle—not that D entered Mitchell's vehicle specifically. As such, Mitchell's objection is sustained, and the Report and Recommendation is modified to remove the statement that "D entered Shaun's vehicle to make the purchase."

### C.    Objection 3

Mitchell objects to the magistrate's statement that "[t]he texts from D's cell phone indicate they first asked to buy 50 fentanyl pills from Mr. Mitchell and then changed that to 56 on June 29, 2023, the date of K's overdose." Docket 118 at 3 (quoting Docket 113 at 8 n.5). Mitchell contends that there is no evidence establishing that he sent the text messages because "D told law enforcement that three individuals used that phone, and there is no evidence regarding who was in possession or using that phone on that particular day." *Id.* at 3-4. The court agrees.

The affidavit for the South Dakota Ping Warrant details a string of text messages between D and the phone associated with the (218) phone number shared by Mitchell and his associates. *See* Docket 92-1 at 12-34. The affidavit also states that Mitchell and his associates shared the (218) phone number.

22

*See id.* at 12 ("It is unknown who the CI was actually communicating with[in] each message, as the phone was utilized by Shaun, Wilson and T3 according to the CI."). Because the record contains no evidence establishing who possessed or was using the phone associated with the (218) phone number on June 29, 2023, Mitchell's objection is sustained. The Report and Recommendation is modified to reflect that "D asked to purchase 50 fentanyl pills through the (218) phone number—access to which was limited to Mitchell and his two associates—and later increased the request to 56 on June 29, 2023, the date of K's overdose."

### D.     Objection 4

Mitchell objects to the magistrate judge's characterization of the testimony that "CI 6 told SA Pennock they had been buying fentanyl from Shaun and his associates nearly daily and that Mr. Mitchell would find it odd if CI 6 did not make a buy very soon." Docket 118 at 4 (quoting Docket 113 at 9). Mitchell argues that the record does not support the statement that he would find it "odd," pointing to Pennock's testimony that "[D] had advised that [they were] purchasing fentanyl from these guys almost daily and that it would be weird, if [they] stopped the purchase." *Id.* (quoting Docket 110 at 32). The distinction Mitchell presses is semantic, not substantive. On this record, there is no meaningful difference between finding it "odd" and finding it "weird" if D failed to make a purchase very soon. The objection is therefore overruled.

### E.    Objection 5

Mitchell objects to the magistrate judge's statement that "[t]hereafter, at SA Pennock 's direction, CI 6 made a controlled buy of 40 fentanyl pills using the (218) phone number to arrange the buy." *Id.* (quoting Docket 113 at 13). Mitchell asserts that the "affidavit indicates that the CI *arranged* a controlled purchase of 40 pills; however, as noted in the R & R, the controlled buy with Wilson on August 23, 2023, resulted in the purchase of 35 pills." *Id.* The court agrees with Mitchell.

The magistrate judge stated that CI 6 "made" a controlled buy of 40 fentanyl pills on August 23, 2023. Docket 113 at 13. The affidavit, however, reflects that CI 6 *arranged* a controlled purchase of 40 pills from Shaun or his associates and, the following day, purchased 35 pills. *Compare* Docket 113 at 13 (Report and Recommendation), *with* Docket 92-1 at 11 (South Dakota Ping Warrant affidavit). Because the record does not support the finding that CI 6 made a controlled buy of 40 pills on August 23, 2023, Mitchell's objection is sustained. The Report and Recommendation is modified to replace "made" with "arranged."

### F.    Objection 6

Mitchell objects to the magistrate judge's statement that "[o]n July 7, 2023, CI 6 purchased 90 pills and the following day they purchased another 60 pills." Docket 118 at 4 (quoting Docket 113 at 14). Mitchell contends that although those quantities appear in the text messages, the record does not

24

establish that the transactions occurred as described in the text messages. *Id.* Mitchell's objection is sustained in part and overruled in part.

As to July 7, 2023, the affidavit reflects that CI 6 texted the (218) phone number and sought to arrange a controlled purchase of 90 fentanyl pills. Docket 92-1 at 22-23. The messages show negotiation over price and availability, including CI 6's request to purchase pills at $5 per pill and the response that the deal was no longer available. *Id.* at 23. The exchange culminated in an agreement to meet at the Ramada on Russell Street in Sioux Falls, South Dakota. *Id.* But nothing in the affidavit confirms that the transaction was completed in the quantity described in the text exchange, much less that 90 pills were in fact purchased. The messages reflect negotiations and plans; they do not confirm that 90 pills were purchased on July 7, 2023. On this point, the magistrate judge's statement extends beyond what the affidavit establishes. *Compare* Docket 113 at 14 (Report and Recommendation), *with* Docket 92-1 at 23 (South Dakota Ping Warrant affidavit). The objection is sustained as to the July 7, 2023, quantity.

The record differs with respect to the July 8, 2023, text messages. The affidavit recounts messages indicating that CI 6 needed 60 pills, followed by a later message stating, "[d]amn did me like that lol only 59 lol." Docket 92-1 at 23. That exchange supports the inference that a transaction occurred and that 59 pills, not 60, were provided. To that extent, the record substantiates a completed purchase on July 8, 2023, albeit in a slightly different quantity than stated in the magistrate judge's report.

Thus, the objection is sustained in part and overruled in part. The Report and Recommendation is modified to reflect that the record does not establish a completed purchase of 90 pills on July 7, 2023, but does establish that CI 6 purchased 59 pills on July 8, 2023.

### G.    Objection 7

Mitchell objects to the use of his name in connection with the messages summarized by the magistrate judge on pages 14 through 16 of the Report and Recommendation. Docket 118 at 4-5. Mitchell argues that, because Pennock stated at the outset of the affidavit in support of the South Dakota Ping Warrant that "[i]t is unknown who the CI was actually communicating with in each message[,]" the record does not provide sufficient evidence to conclude that Mitchell was the individual sending or receiving any of the summarized messages. *Id.* at 5 (quoting Docket 92-1 at 12). Mitchell's objections concern the magistrate judge's attribution to him of messages sent from the (218), (605), and (612) phone numbers. *See id.* He specifically challenges the following 10 statements in the magistrate judge's report:

1. On July 10 Mr. Mitchell wrote that he was not coming to make the exchange of drugs for money, but his brother was.

2. On July 11, 2023, Mr. Mitchell directed CI 6 to contact him on a different phone number with a (605) area code.

3. On August 5, 2023, CI 6 wrote to Mr. Mitchell "are these [pills] different? . . . On August 6 they elaborated [on that] question, stating that "we all and everyone that got [some of Mr. Mitchell's pills] said they tasted different. . . When Mr. Mitchell assured CI 6 that the pills were the same. . . .

26

4. On August 11, 2023, D texted Mr. Mitchell and asked "Who this?" . . . Mr. Mitchell responded "Blue. I'll be here."

5. Another reference to CI 6 reselling the pills was a comment on August 19 asking Mr. Mitchell to sell them pills at the $10 price. . . . This is apparently in reference to Mr. Mitchell raising the price of the pills from $10 to $12.

6. The forensic examination of CI 6's phone also revealed numerous text messages between CI 6 and Mr. Mitchell at the (605) area code cell phone that Mr. Mitchell had asked CI 6 to use. . . . These texts also reveal CI 6 was reselling the pills they bought from Mr. Mitchell.

7. Finally, examination of CI 6's phone also revealed a series of texts between CI 6 and Mr. Mitchell at the (612) area code cell phone.

8. The texts with the (612) number also show that CI 6 was purchasing large quantities of fentanyl pills from Mr. Mitchell on a near-daily basis.

9. Using the (612) number, CI 6 asked whether Mr. Mitchell lived in Sioux Falls. . . . When CI 6 asked him where he lived, stating that he had Minnesota plates, Mr. Mitchell responded "I'm from Minnesota from the cities but I'm in a small town in South Dakota" and "I'm 30 minutes north from Sioux Falls."

10. Other times CI 6 stated they owed Mr. Mitchell $200.

*Id.* at 5-6 (quoting Docket 113 at 14-16). The court addresses Mitchell's objections concerning each phone number below.

### 1. The (218) phone messages

After reviewing the affidavit, the court agrees that the record does not definitively attribute the referenced messages between CI 6 and the (218) phone number to Mitchell. Pennock makes clear in the affidavit that he is unsure who CI 6 was actually communicating with in the text exchanges because the (218) phone number "was utilized by Shaun [Mitchell], Wilson, and [Wilson's son,]

27

according to the CI." Docket 92-1 at 12. The affidavit further provides that "[f]or documentation purposes, however, messages from [the (218) phone number] will be documented as Shaun [Mitchell] (SM)." *Id.* That convention, while administratively convenient, does not resolve the underlying uncertainty about the author behind the relevant text exchanges. Moreover, the affidavit explains that CI 6 had the (218) phone number saved in her phone as both Mitchell and Wilson. *Id.* at 35.

The affidavit also explains that CI 6 "purchased Fentanyl from one of three males almost daily" over a period of five to eight months, and at the time of the interview, CI 6 "knew only one of the three males by first name, Shaun [Mitchell]." *Id.* at 10. The affidavit states that "[t]he CI explained he/she would be required to call [the (218)] phone number . . . to arrange any Fentanyl purchases made from the group." *Id.* The affidavit later clarifies that CI 6 "purchased Fentanyl from all three males, Shaun Mitchell, William Wilson, and his son T3 . . . arranged via [the (218)] phone number." *Id.* at 11.

Taken together, these statements establish that the (218) phone number was shared among three individuals and that CI 6 conducted transactions with each of them. *Id.* What they do not establish, however, is which individual authored any particular message, as relevant here, summarized in the affidavit. Because the record leaves that question unresolved, the affidavit does not support attributing the specific communications at issue solely to Mitchell.

The United States asserts that the message descriptions in the Report and Recommendation are appropriate because they reflect how Pennock

28

included them in the warrant affidavit. *See* Docket 124 at 4-5. But the United States misunderstands the purpose of the magistrate judge's report. The report is intended to summarize the evidence accurately and assess the sufficiency of the record; it is not a mere restatement of how an affiant chose to document messages. While Pennock used a convention of attributing all communications from a shared number to Mitchell for "documentation purposes," that procedural choice does not resolve the underlying uncertainty regarding authorship of the relevant text messages stemming from the (218) phone number. The record does not conclusively establish that Mitchell personally sent or received the messages at issue.

Thus, Mitchell's objection is sustained. The report is modified to describe the messages as originating from the (218) phone number, attributing them to "Mitchell or Wilson" or "Mitchell or his associates".

### 2. The (605) phone messages

For similar reasons, the court sustains Mitchell's objection to the magistrate judge's attribution of the (605) phone number messages to him. In the affidavit, Pennock states that CI 6 began messaging the (605) phone number on June 21, 2023, and continued through July 18, 2023. Docket 92-1 at 35. The affidavit states that "[t]his is the phone number Shaun [Mitchell] directed [t]he CI to contact when he was unavailable on July 11, 2023." *Id.*; *see also id.* at 24.

As was true of the (218) phone number, the affidavit does not establish that Mitchell was the sole user of the (605) phone number or that he personally

29

authored the messages that the affidavit and the magistrate judge attributed to him. The affidavit reflects that Pennock imprecisely associates Mitchell as the one who "directed [t]he CI to contact [him] when he was unavailable on July 11, 2023." *Id.* at 35; *see also id.* at 24. But as stated previously, it could have been Mitchell or Wilson who directed CI 6 to message the (605) phone number on July 11, 2023. Multiple individuals were associated with the (218) phone number, and nothing in the affidavit definitively identifies Mitchell as the sender of the specific communications at issue summarized in the report. Nor does the affidavit provide independent corroboration—such as surveillance, admissions, or subscriber records—linking Mitchell personally to those particular messages.

In the absence of evidence resolving that uncertainty, the magistrate judge's attribution of the (605) phone number messages directly to Mitchell goes beyond what the affidavit supports. Pennock stated in the affidavit that the (218) phone number was linked to three individuals, and yet, "for documentation purposes," he conclusively refers to Mitchell as the author of all messages. *See id.* at 12. The record does not support that attribution, and the magistrate judge's reliance on it overstates the facts supported by the record. Thus, the objection is sustained, and the report is modified to describe the messages as originating from the (605) phone number, without attributing them specifically to Mitchell.

### 3.    The (612) phone messages

Unlike the messages sent from the (218) and (605) phone numbers, the magistrate judge's report correctly attributes to Mitchell the messages sent from the (612) phone number. The affidavit contains corroborating evidence supporting the reasonable inference that Mitchell was the author of the messages sent to CI 6 from the (612) phone number. Specifically, it states that a review of CashApp records links the (612) phone number to the "CashApp account $BreezyMoney22," which is associated with the name Shaun Mitchell. *Id.* at 38. This connection provides independent support for attributing the messages to Mitchell, because it links the phone number used to send the messages with a CashApp account bearing his name. This evidence allows a reasonable inference that Mitchell was the individual communicating from the (612) number to CI 6. Unlike the (218) and (605) phone numbers discussed above, the record supports attributing these particular messages directly to Mitchell, and the magistrate judge's report properly does so. As such, Mitchell's objection as to the magistrate judge's characterization of the messages sent from the (612) phone number is overruled.

### H.    Objection 8

Mitchell objects to the magistrate judge's statement that "[t]he affidavit stated that police began to receive the results of the PRTT on Mr. Mitchell's cell phone and observed that he traveled between Sioux Falls and Minneapolis, Minnesota, several times." Docket 118 at 6 (quoting Docket 113 at 19). Mitchell

31

points to the affidavit for the mobile tracking device warrant and argues that it actually stated "[a]s a result of the PRTT law enforcement has learned that Mitchell's phone has traveled to Sioux Falls, SD on several occasions and also has traveled to the Minneapolis, MN area." *Id.* (quoting Docket 92-4 at 5).

After reviewing the affidavit, the court agrees with Mitchell and sustains the objection. *See* Docket 92-4 at 5. The magistrate judge's statement mischaracterizes the language of the warrant affidavit. Because the affidavit states that law enforcement, through the PRTT placed on Mitchell's phone, learned that he "traveled to Sioux Falls, SD on several occasions and also has traveled to the Minneapolis, MN area," *id.*, the Report and Recommendation is modified to mirror the language of the affidavit quoted above.

## I.    Objection 9

Mitchell objects to the magistrate judge's statement that "the affidavit in support of the search/tracking warrant 'is identical' to that for the Dodge Charger." Docket 118 at 6 (quoting Docket 113 at 19). Mitchell takes issue with the magistrate judge's characterization of the affidavits as "identical," contending that although the applications are very similar, the affidavit supporting the warrant to track the Suburban did not include information regarding surveillance of him in Sioux Falls on October 19, 2023, or near his Luverne residence on October 23, 2023. *Id.*

After reviewing the affidavits supporting the search warrants for Mitchell's Suburban and Charger, the court agrees with Mitchell. *See* Docket 92-4 at 5; Docket 92-5 at 4. The affidavit supporting the warrant for the

32

Charger contains two additional paragraphs describing surveillance of Mitchell that were not included in the affidavit supporting the warrant for the Suburban. As such, the objection is sustained, and the Report and Recommendation is modified to replace "is identical" with "is very similar."

### J.    Objection 10

Mitchell objects to the magistrate judge's statement: "However, adding up the numbers of pills when CI 6 *did* specify how many they wanted showed that CI 6 had purchased 2,298 fentanyl pills from Mr. Mitchell and his relatives at the (218) number in the two-month period covered by the texts." Docket 118 at 6-7 (quoting Docket 113 at 20). Mitchell argues that this misconstrues the language of the affidavit, noting that the affidavit specifically states that the "number of pills *requested* totaled 2,298 Fentanyl pills." *Id.* at 7 (quoting Docket 92-6 at 9).

After reviewing the affidavit in support of the target cellular device warrant, the court agrees with Mitchell. *See* Docket 92-6 at 9. The affidavit states that "the times the CI did message[,] the number of pills *requested* totaled 2,298 Fentanyl pills." *Id.* Because there is a material distinction between the number of pills requested and the number purchased, Mitchell's objection is sustained, and the Report and Recommendation is modified to replace "purchased" with "requested."

### K.    Objection 11

Mitchell objects to the magistrate judge's statement: "Similarly, the affidavit stated that CI 6 purchased fentanyl pills from Mr. Mitchell at the (605)

phone number. . . . CI 6 purchased 293 pills from Mr. Mitchell during this one-month period using the (605) number. . . . Thus, information from texts between CI 6 and the (218) and (605) numbers showed that CI 6 purchased approximately 2,500 fentanyl pills from Mr. Mitchell or his associates in the two-month period from June 17 to August 19, 2023." Docket 118 at 7 (quoting Docket 113 at 20). Mitchell specifically attacks the statement: "CI 6 purchased 293 pills from Mr. Mitchell during this one-month period using the (605) number," asserting that the magistrate judge overstates the affidavit's language and that the record does not support a finding that the pills were in fact purchased or that Mitchell personally sold them. *Id.*

After reviewing the affidavit in support of the target cellular device warrant, the court agrees with Mitchell. *See* Docket 92-6 at 9. The affidavit states that "the CI ordered approximately 293 Fentanyl pills from Shaun and/or his associates." *Id.* By contrast, the magistrate judge stated that "CI 6 purchased 293 pills from Mr. Mitchell." Docket 113 at 20. That characterization both overstates the language of the affidavit and attributes the sale more precisely than the record permits. The affidavit reflects only that CI 6 ordered the pills and that the order was placed with "Mitchell and/or his associates." Docket 92-6 at 9. It does not definitively establish that the transaction was completed, nor does it establish that Mitchell personally conducted the sale. Rather than accurately summarizing the affidavit, the report misconstrues its language and draws conclusions not supported by the record.

34

Because there is a material distinction between ordering and purchasing, and between a transaction involving "Mitchell and/or his associates" and one involving Mitchell alone, the magistrate judge's statement exceeds what the affidavit supports. Thus, the objection is sustained, and the Report and Recommendation is modified to describe the messages as originating from the (218) phone number, attributing them to Mitchell or his associates.

**L.    Objection 12**

Mitchell objects to the magistrate judge's statement that "[o]n November 30, 2023, CI 6 made a controlled buy of 50 fentanyl pills from Mr. Mitchell." Docket 118 at 7 (quoting Docket 113 at 23). Mitchell contends that the affidavit reflects that the purchase consisted of 48 pills, not 50. *Id.* After reviewing the affidavit in support of the search warrant for the Sioux Falls storage unit, Dodge Charger, Chevy Suburban, and Mitchell's person, the court agrees with Mitchell. *See* Docket 92-7 at 37.

The affidavit states that on November 29, 2023, CI 6 "arranged the controlled purchase of fifty (50) Fentanyl pills from Mitchell." *Id.* The affidavit then states that the next day, CI 6 "made a controlled purchase of forty-eight suspected Fentanyl pills from Mitchell for the agreed purchase price of $500." *Id.* Thus, the objection is sustained, and the Report and Recommendation is modified to reflect that CI 6 purchased 48 pills from Mitchell on November 30, 2023.

### M.    Objection 13

Mitchell objects to the magistrate judge's attribution to him of additional messages from the (218) and (605) phone numbers when analyzing the affidavit supporting the South Dakota Ping Warrant. Docket 118 at 7-8. Specifically, he challenges the portions of the report stating that: "CI 6 was purchasing great quantities of fentanyl pills from Mr. Mitchell"; "CI 6 told Mr. Mitchell they would need more pills later"; and "before CI 6 could tell Mr. Mitchell how many they wanted to buy from him . . . ." *Id.* (quoting Docket 113 at 39). Mitchell contends that the record does not contain sufficient evidence to establish that he was the individual involved in these messages. *Id.* at 8. Mitchell explains that the (218) phone number was associated with three different individuals, leaving the record unclear as to whether Mitchell personally sent or received the specific texts in question. *Id.* Mitchell further notes that the final statement he challenges was based on a text sent from CI 6 to the (605) number, and there is similarly insufficient evidence to show that Mitchell authored that message. *Id.*

In response, the United States contends that the text messages, together with the hearing testimony, provide sufficient evidence to support a finding that CI 6 purchased large quantities of pills from Mitchell and did so on a frequent basis. Docket 124 at 6. The United States points to Pennock's testimony in which CI 6 "told him [they] had repeatedly purchased pills from "Shaun" and that "it appeared from [CI 6's] phone that CI 6 had first communicated with Mitchell on his Facebook account." *Id.*

36

After reviewing the affidavit in support of the South Dakota Ping Warrant and the hearing testimony, the court agrees with Mitchell. As set forth in Section G, *supra,* the (218) phone number was shared among three individuals, and CI 6 conducted transactions with each of them. The affidavit does not establish which individual authored any particular message summarized in the report. *See* Docket 92-1 at 12 (affiant explaining that the (218) phone number "was utilized by Shaun [Mitchell], Wilson, and [Wilson's son,] according to the CI."). Because the record leaves that question unresolved, the affidavit does not support attributing the messages from the (218) phone number solely to Mitchell. The same conclusion applies to the messages stemming from the (605) phone number. *See supra,* Section G.2.

Although the United States points to testimony from Pennock that CI 6 had repeatedly purchased pills from Mitchell and initially communicated with Mitchell through Facebook, that evidence does not resolve the attribution problem presented by the text messages at issue. The question is not whether CI 6 purchased pills from Mitchell at some point, but whether the particular messages summarized in the affidavit and attributed in the report may properly be ascribed to Mitchell. The cited testimony does not identify Mitchell as the sender or recipient of those specific texts. Thus, while the broader record may support an inference that CI 6 purchased pills from Mitchell on multiple occasions, it does not establish that Mitchell personally sent or received the particular messages relied upon by the magistrate judge in this instance.

The Report and Recommendation is therefore modified to describe the messages as originating from Mitchell or his associates.

### N.   Objection 14

Mitchell objects to the magistrate judge's statement: "[f]or example, one affidavit summarized that CI 6 *bought* approximately 2,500 fentanyl pills from Mr. Mitchell and his relatives." Docket 118 at 8 (emphasis added) (quoting Docket 113 at 39). Mitchell contends that the affidavit in support of the target cellular device warrant only states that the pills were "requested" or "ordered." *Id.* Mitchell asserts that the record does not support a finding that the pills were actually purchased. *Id.*

After reviewing the affidavit in support of the target cellular device warrant, the court agrees with Mitchell. *See* Docket 92-6 at 9. The affidavit states that "the times the CI did message[,] the number of pills *requested* totaled 2,298 Fentanyl pills." *Id.* (emphasis added). As noted above, *see supra* Section K, because there is a material difference between the number of pills requested and the number purchased, Mitchell's objection is sustained. The record does not support a finding that CI 6 purchased the amount of pills, but only that such an amount was requested via text messages. *See* Docket 92-6 at 9. Thus, the Report and Recommendation is modified to replace "purchased" with "requested."

### O.   Objection 15

Mitchell objects to the magistrate judge's statement that "[a]ll of the search warrants indicated that CI 6 was buying 20 to 80 pills from Mr. Mitchell

on a near-daily basis for approximately five to eight months prior to August 2023." Docket 118 at 8 (quoting Docket 113 at 39). Mitchell argues that the warrants describe messages exchanged with phone numbers associated with multiple individuals and, therefore, the record does not support a finding that Mitchell personally sold the pills to CI 6. *Id.*

After reviewing the warrants at issue, the court agrees with Mitchell. *See* Dockets 92-1, 92-4, 92-5, 92-6, 92-7. The magistrate judge's statement that "[a]ll of the search warrants indicated that CI 6 was buying 20 to 80 pills from Mr. Mitchell on a near daily basis" is overly broad. Docket 113 at 39. As previously discussed, the affidavits make clear that the (218) phone number was associated with multiple individuals—not just Mitchell. *See, e.g.*, Docket 92-1 at 12. The same goes for the messages associated with the (605) number. *See id.*; *supra*, Section G.2. Although the magistrate judge's report correctly attributes to Mitchell the messages sent from the (612) phone number that exist in two of the warrants, *see* Dockets 92-1, 92-7; *supra*, Section G.3, it is inaccurate to state that "[a]ll of the search warrants" indicate that Mitchell personally sold pills to CI 6. The warrant affidavits do not uniformly attribute the frequent purchases to Mitchell himself.

The United States contends that "there is evidence from the warrants and Agent Pennock's [hearing] testimony that CI 6 was purchasing fentanyl from Mitchell on a very frequent basis." Docket 124 at 7. The United States, however, does not identify specific testimony establishing that Mitchell personally conducted the transactions at issue to support the magistrate

39

judge's statement that "[a]ll of the search warrants indicated that CI 6 was buying 20 to 80 pills from Mr. Mitchell on a near-daily basis for approximately five to eight months prior to August 2023." *See id.*; Docket 113 at 39. Nor does it point to evidence resolving the attribution concerns discussed above. Its argument instead relies on generalized references to the hearing testimony.

That contention is unpersuasive. As previously explained, some of the warrants describe communications with phone numbers associated with multiple individuals. *See* Docket 92-1 at 12; Docket 92-7 at 8-9. While the record may support an inference that CI 6 was purchasing fentanyl on a frequent basis from Mitchell and his associates, it does not uniformly establish that Mitchell himself was the seller in each instance. Absent evidence specifically tying Mitchell to the particular transactions at issue, the United States's broader characterization extends beyond what the record supports.

At most, the warrants reflect that CI 6 was arranging near-daily pill purchases through phone numbers used by Mitchell and his associates. They do not consistently establish that Mitchell personally conducted each of those transactions. As such, the magistrate judge's characterization sweeps more broadly than the record supports. The objection is sustained, and the report is modified to reflect that the warrants describe frequent purchases arranged through various phone numbers—associated with Mitchell and his associates— rather than purchases made exclusively from Mitchell.

### P.    Objection 16

Mitchell objects to the magistrate judge's statement that "CI 6 made two controlled buys from Wilson using a number Mr. Mitchell had given her." Docket 118 at 8 (quoting Docket 113 at 42). He argues that the record contains insufficient evidence to support a finding that Mitchell provided CI 6 with the phone number. *Id.* In response, the United States contends that Pennock's testimony shows that CI 6 met Mitchell through Jordan Reese and that CI 6 "also provided the (218)-[phone] number as the shared phone number that the group used." Docket 124 at 7. The United States asserts that it is a reasonable inference that, because CI 6 met Mitchell first, he would have been the one to give her the number to contact the group. *Id.* at 7-8.

After reviewing the affidavit in support of the South Dakota Ping Warrant and the hearing testimony, the court agrees with the United States. Although the affidavit does not explicitly state that Mitchell personally gave CI 6 the (218) phone number, *see* Docket 92-1, the testimony and context provide a reasonable basis to infer that he did. CI 6's initial contact with the group was through Mitchell, whom CI 6 met through Jordan Reese, and the shared (218) number was then used to coordinate purchases among group members. Docket 110 at 20-21. Given these circumstances, attributing to Mitchell as providing CI 6 with the (218) phone number is a reasonable and supported inference. Thus, Mitchell's objection is overruled.

**Q.     Objection 17**

Mitchell objects to the magistrate judge's statement: "and not Mr. Mitchell, who is alleged to have been the one who supplied CI 6 with the fentanyl pills that killed K." Docket 118 at 8-9 (quoting Docket 113 at 43 n.14). Mitchell points to the hearing testimony and contends that "[a]s noted above, the testimony established that CI 6 did not recall who she met with to obtain the fentanyl that day." *Id.* at 9.

After reviewing the hearing transcript, the court agrees with Mitchell. Pennock testified that CI 6 stated CI 6 travelled to Sioux Falls "to purchase fentanyl from Shaun [Mitchell] or one of his associates" and that CI 6 "couldn't remember who for sure." Docket 110 at 26; *see also id.* at 27. This testimony reflects uncertainty as to the identity of the individual who supplied the pills.

Because the record shows that CI 6 was unsure from whom CI 6 purchased the fentanyl that resulted in K's death, the magistrate judge's statement that Mitchell was "alleged to have been the one who supplied CI 6 with the fentanyl pills that killed K" sweeps more broadly than the evidence supports. Docket 113 at 43 n.14. The testimony does not single out Mitchell as the supplier; rather, it indicates that the pills may have come from Mitchell or one of his associates. Absent evidence resolving that uncertainty, attributing the fatal pills specifically to Mitchell overstates the record. As such, Mitchell's objection is sustained, and the report is modified to remove this statement.

### R.   Objection 18

Mitchell's final factual objection concerns the magistrate judge's statement that "he confirmed that Mr. Mitchell's nickname was 'Blue,' a name Mr. Mitchell used to describe himself in texts with CI 6." Docket 118 at 9 (quoting Docket 113 at 52). Mitchell contends that the text messages at issue were part of exchanges that could have been sent by him or his associates and that the record does not establish that he personally authored the messages referencing the name "Blue." *Id.* Mitchell further asserts that, during Wright's post-*Miranda* interview, Wright later expressed uncertainty as to which individual used the alias. *Id.* The interview itself, however, is not part of the record before the court. Mitchell's characterization of that exchange appears only in his briefing. *See id.*; Docket 111 at 1.

In response, the United States contends that although the text messages between CI 6 and the (218) phone number could have been sent by Mitchell or his associates, Pennock's testimony that Wright knew Mitchell as "Blue" independently verifies that Mitchell's nickname was in fact "Blue." Docket 124 at 8.

The court overrules Mitchell's objection. The court's review is confined to the record. Statements in a brief, even if made in good faith, do not constitute evidence. *United States v. Fetlow*, 21 F.3d 243, 248 (8th Cir. 1994) ("[S]tatements of counsel are not evidence."). Absent the interview video, transcript, or other record support for the asserted clarification by Wright

43

during his post-*Miranda* interview, the court cannot rely on Mitchell's description of it to undermine the magistrate judge's finding.

The record that is properly before the court includes Pennock's testimony that Wright knew Mitchell by the nickname "Blue." Docket 110 at 64-65. While Mitchell disputes whether particular text messages can be attributed to him personally, the magistrate judge's finding does not rest solely on authorship of a specific message but on the broader evidentiary record linking Mitchell to the alias. Thus, Mitchell's objection is overruled.

## II.    Legal Objections

The Fourth Amendment permits issuance of a search warrant only upon a showing of probable cause. *United States v. Williams*, 477 F.3d 554, 557 (8th Cir. 2007). "In evaluating probable cause, a judicial officer reviewing an application for a search warrant does not use a hypertechnical approach." *United States v. Buchanan*, 574 F.3d 554, 561 (8th Cir. 2009). Instead, the officer considers the totality of the circumstances and makes a practical, commonsense determination based on factors such "as the veracity of the affidavit and the basis of knowledge of any person supplying hearsay information." *Id.* "Probable cause requires that the circumstances set forth in an affidavit supporting an application for a search warrant demonstrate 'a fair probability that contraband or evidence of a crime will be found in a particular place.' " *United States v. Tyler*, 238 F.3d 1036, 1038 (8th Cir. 2001) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "The core question in assessing probable cause based upon information supplied by an informant is whether

44

the information is reliable." *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993).

Under *Franks v. Delaware*, 438 U.S. 154 (1978), a defendant challenging a search warrant bears the burden of proving, by a preponderance of the evidence, that (1) the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement in the affidavit; and (2) the affidavit does not establish probable cause once the challenged material is set aside. 438 U.S. at 156, 171-72; *Buchanan*, 574 F.3d at 561.

The same framework applies to omissions. *Buchanan*, 574 F.3d at 561. A defendant must show that the affiant intentionally or recklessly omitted material information in a manner that rendered the affidavit misleading, and that the affidavit would not support a finding of probable cause if the omitted information were included. *Id.*

Affidavits supporting search warrants are considered presumptively valid. *Franks*, 438 U.S. at 171. Omissions "do not constitute misrepresentations unless they cast doubt on the existence of probable cause." *United States v. Butler*, 594 F.3d 955, 961 (8th Cir. 2010). Omissions may support an inference of recklessness when the material omitted would have been "clearly critical" to the finding of probable cause. *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986) (internal quotation marks omitted). "A showing of deliberate or reckless falsehood is 'not lightly met.' " *Butler*, 594 F.3d at 961 (quoting *United States v. Wajda*, 810 F.2d 754, 759 (8th Cir. 1987)).

45

Where, as here, a reviewing court must determine whether probable cause supported the issuance of a search warrant, its role is limited. *Buchanan*, 574 F.3d at 561. The court must ensure that the issuing judicial officer had a "substantial basis for concluding that probable cause existed," *id.* (internal quotation marks omitted), and it "must accord substantial deference" to that determination, *id.* (quoting *Williams*, 10 F.3d at 593).

A showing of mere negligence or innocent mistake is insufficient to establish a *Franks* violation. *Butler*, 594 F.3d at 961. To determine whether an affiant acted with reckless disregard for the truth, the court asks whether, in light of all the evidence, "the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Id.*

Mitchell raises three legal objections to the Report and Recommendation. *See* Docket 118 at 9-17. First, he argues that the magistrate judge erred in concluding that Pennock did not deliberately or recklessly omit material information from the affidavits in question. *Id.* at 9-12. Second, he contends that the magistrate judge erred in finding that each of the five challenged affidavits established probable cause even when the allegedly omitted information is included. *Id.* at 12-16. Third, he argues that the magistrate judge erred in concluding that the subsequent warrants were not tainted as fruit of the poisonous tree. *Id.* at 16-17.

46

**A.    Whether Agent Pennock deliberately or recklessly omitted material information from the affidavits at issue**

Mitchell contends that Special Agent Pennock deliberately or recklessly omitted material information from the affidavits, including facts regarding CI 6 and Wright, in a manner that rendered the affidavits misleading. *Id.* at 9. He argues that the affidavits mischaracterized CI 6 as solely a drug purchaser, omitting that CI 6 had engaged in selling fentanyl, sold drugs with their children present, and played a role in K's overdose. *Id.* at 10. Mitchell further notes that the affidavits did not disclose CI 6's criminal history, potential charges, or motivation for cooperating, and that law enforcement omitted Wright's statements denying that he had ever seen Mitchell possess firearms or discussed firearms with him. *Id.*; Docket 92 at 12-13. According to Mitchell, these omissions were made with a deliberate or at least reckless disregard for the truth. Docket 118 at 9.

Mitchell also objects to the magistrate judge's use of certain examples of facts unrelated to CI 6 that were not included in Pennock's affidavits, which the magistrate judge cited as circumstantial support for Pennock's testimony that he included only as much information as he thought necessary to establish probable cause. *Id.* at 10-11. For instance, the magistrate judge noted that before applying for his first search warrant, Pennock was informed that CI 6's Sioux Falls source of pills went by the name "Shaun," and that he did not include this corroborating detail in the affidavits. Docket 113 at 30. Similarly, the magistrate judge highlighted that after Wilson was chased by police, the

47

(218) phone number went dead—a fact not included in the affidavit—which the magistrate judge offered as further circumstantial evidence supporting Pennock's explanation for limiting the scope of the affidavits to include only as much information as necessary to support a finding of probable cause. *Id.* Mitchell argues that these omissions could have undermined probable cause and that the magistrate judge's inference that they merely illustrate Pennock's judgment about relevance is not justified. Docket 118 at 11. In particular, he contends that the disappearance of the (218) number cannot reasonably support an inference that he was associated with Wilson because there is no evidence he was present at the stop or even knew it had occurred. *Id.*

Mitchell further asserts that Pennock, an experienced investigator with years at the South Dakota Division of Criminal Investigation and prior corrections experience, was deeply involved in K's overdose investigation and possessed substantial information about CI 6's criminal history, cooperation, recent drug sales, and motivations. *Id.* Given that knowledge, Mitchell contends that Pennock's claim that he viewed this information as irrelevant or unnecessary should not be credited. *Id.* at 12.

The court finds that the magistrate judge did not err in concluding that Mitchell has not met his burden under *Franks* of showing by a preponderance of the evidence that Pennock knowingly or recklessly omitted information in a manner that would undermine probable cause. *See* Docket 113 at 29-32;

48

*United States v. Miller*, 11 F.4th 944, 952-53 (8th Cir. 2021).[5] Under *Franks*, omissions are reckless only if the affiant entertained serious doubts about the accuracy of the information or had obvious reasons to question it. 438 U.S. at 156, 171-72; *Buchanan*, 574 F.3d at 561. Nothing in the record suggests that Pennock omitted information regarding CI 6's background or potential legal exposure to secure probable cause in the affidavits.

Pennock's testimony at the *Franks* hearing, where he provided reasonable explanations for why certain evidence was included in the affidavits while other details were omitted, supports that conclusion. *See* Docket 110 at 50-53, 108-10. Mere disagreement with the affiant's judgment about relevance or a difference in opinion regarding the inclusion of certain background information does not constitute reckless or deliberate omission. *See United States v. McIntyre*, 646 F.3d 1107, 1114 (8th Cir. 2011) ("Allegations of negligence or innocent mistake will not suffice to demonstrate reckless or deliberate falsehood." (emphasis omitted)). Even assuming Pennock intentionally omitted certain details, there is no indication that he entertained

---

[5] Even assuming Pennock intentionally omitted certain details, the totality of the corroborated evidence—including verified phone communications, Docket 92-1 at 38-40; Docket 92-6 at 9-11; Docket 92-7 at 30-32, physical surveillance of Mitchell's vehicles and residence, Docket 92-4 at 4-5; Docket 92-5 at 4; Docket 92-6 at 11; Docket 92-7 at 34-39, and Wright's statements identifying Mitchell as a fentanyl supplier, Docket 92-7 at 36, 39-40—demonstrates a substantial basis for probable cause. Likewise, controlled purchases supervised by law enforcement involving Wilson, Docket 92-1 at 11-12; Docket 92-4 at 4; Docket 92-5 at 3-4; Docket 92-6 at 8-9, 11; Docket 92-7 at 8, along with Wright's statements identifying Mitchell as a fentanyl supplier, corroborated CI 6's reporting and the broader trafficking context, Docket 92-7 at 36, 39-40.

serious doubts about the truth of the affidavits or had obvious reasons to question the accuracy of the information he reported. *See* Docket 110 at 6-148. While Pennock's omissions may have been relevant, they do not constitute the type of deliberate or reckless falsehood required to invalidate a warrant. *See Williams*, 477 F.3d at 559-60 (rejecting *Franks* challenge where omitted information about informant did not alter probable cause because the information was "at least partly corroborated"); *Butler*, 594 F.3d at 961-63 (holding that omissions do not constitute reckless disregard under *Franks* unless they cast real doubt on the existence of probable cause).

Thus, viewed as a whole, the court concludes that the omissions cited by Mitchell do not reflect deliberate or reckless disregard for the truth and do not invalidate the warrants.

B.     **Whether the affidavits established probable cause even if the allegedly omitted information is included**

Mitchell next objects to the magistrate judge's conclusion that, even if the omitted information were included, each of the five challenged affidavits would still establish probable cause. Docket 118 at 12. He argues that Pennock failed to disclose that CI 6 faced potential legal consequences for CI 6's admitted involvement in K's fentanyl overdose death and the risk of having CI 6's children removed from the home due to selling fentanyl in their presence. *Id.* at 13. Mitchell also challenges the magistrate judge's finding that "the affidavits were replete with other facts that did not come solely from CI 6's mouth," *id.* at 14 (quoting Docket 113 at 41), contending that aside from the

50

text messages, CI 6 was the primary source linking Mitchell to drug activity, *id.* Although law enforcement conducted some research and surveillance of Mitchell, he maintains that these efforts did not reveal any drug activity. *Id.* Mitchell notes that the controlled purchases involved Wilson, not him, and that there was no evidence linking the (218) or (605) numbers to him except for CI 6's statements. *Id.* While CI 6 was interviewed face-to-face, provided first-hand observations, and made statements against CI 6's penal interest, Mitchell argues that these statements were made only after Pennock confronted CI 6 about selling drugs in the presence of CI 6's children. *Id.*

The court evaluates probable cause based solely on the information contained in the affidavit submitted in support of the warrant. *United States v. Roberts*, 975 F.3d 709, 713 (8th Cir. 2020). Probable cause requires only a fair probability that evidence of a crime will be found, based on the totality of the circumstances, and the reviewing court must give substantial deference to the issuing judicial officer's determination. *Tyler*, 238 F.3d at 1038; *Gates*, 462 U.S. at 238-39; *Williams*, 10 F.3d at 593.

### 1.    Exhibit 1 – October 11, 2023, South Dakota Ping Warrant for the (612) Cell Phone

The magistrate judge correctly concluded that the affidavit provided a substantial basis for finding probable cause, even when the allegedly omitted information is included. Docket 113 at 38-47. Even considering Mitchell's objections, including that CI 6 faced potential legal consequences from CI 6's admitted involvement in K's fentanyl overdose and the risk of having CI 6's

51

children removed due to selling fentanyl in their presence, the affidavits still establish probable cause. While Mitchell emphasizes that some of the corroborating evidence—such as the (218) and (605) numbers and controlled purchases—did not directly involve him, the affidavits reflect multiple independent sources that supported CI 6's statements.

CI 6's statements describe repeated fentanyl purchases from Mitchell and his associates over several months, including discussions of resale. Docket 92-1 at 38-39. The affidavit identified the verified (612) number as directly linked to Mitchell via CashApp, *id.* at 38-40, and described additional communications between CI 6 and the broader (218) and (605) numbers associated with Mitchell and his associates arranging fentanyl purchases, *id.* at 12-38. Physical surveillance of Mitchell's vehicles and residence, along with Wright's statements identifying Mitchell as a fentanyl supplier, and financial evidence—such as bills recovered from Wilson's vehicle that matched those used in prior controlled buys—further corroborated CI 6's reporting. Docket 113 at 41, 43-44, 47-49, 51-52. Collectively, this information provided a substantial basis for the issuing judicial officer to conclude that Mitchell was engaged in illegal fentanyl trafficking.

Additionally, the affidavit noted that CI 6 made statements face-to-face to law enforcement, which included first-hand observations and statements that were against CI 6's own penal interest. Docket 92-1 at 10-11. This further bolsters CI 6's reliability rather than undermines it. *See United States v. Mays*, 993 F.3d 607, 615 (8th Cir. 2021) (holding that "personal questioning"

52

enhances reliability and credibility). Under the totality of the circumstances, the potential personal consequences to CI 6 do not undermine the corroborated evidence or the fair probability that evidence of Mitchell's drug activity would be found. *See Tyler*, 238 F.3d at 1038; *Williams*, 10 F.3d at 593.

Mitchell argues that his case is distinguishable from Eighth Circuit precedent, including *United States v. Tyler*, 238 F.3d 1036 (8th Cir. 2001), *United States v. Smith*, 266 F.3d 902 (8th Cir. 2001), and *United States v. Riaski*, 91 F.4th 933 (8th Cir. 2024). Docket 118 at 12. He contends that, unlike *Tyler* and *Smith*—where controlled buys involved the defendant—none of the controlled buys in the affidavits involved Mitchell; rather, they involved Wilson, his codefendant. *Id.* Similarly, Mitchell emphasizes that in *Riaski*, the informant had a history of accurate reporting and controlled purchases, whereas CI 6's motivations here, including potential legal consequences from the fentanyl overdose and the presence of children during sales, could have impacted CI 6's credibility. *Id.* at 12-13.

These arguments fail. While it is true that the affidavits do not contain evidence that CI 6 conducted controlled buys directly from Mitchell, the affidavits relied on multiple independent sources that corroborated CI 6's reporting. The verified (612) phone number linked to Mitchell, Docket 92-1 at 38-40; Docket 92-6 at 9-10; Docket 92-7 at 30-32, extensive surveillance observations of Mitchell's vehicles and residence, Docket 92-4 at 4-5; Docket 92-5 at 4; Docket 92-6 at 11; Docket 92-7 at 34-39, and Wright's statements identifying Mitchell as a fentanyl supplier, Docket 92-7 at 36, 39-40, all

53

provided a substantial basis for probable cause, independent of the controlled buys involving Wilson. The magistrate judge correctly determined that the distinctions Mitchell highlights are legally irrelevant because probable cause does not require direct controlled buys from the defendant so long as the totality of circumstances supports a fair probability that evidence will be found. *Tyler*, 238 F.3d at 1038; *Williams*, 10 F.3d at 593.

Thus, even considering CI 6's motivations and the distinctions Mitchell identifies, the affidavit established probable cause, and Mitchell's objection is overruled.

### 2. Exhibits 4 & 5 – October 24, 2023, Minnesota Tracking Warrant for the Dodge Charger and Chevy Suburban, respectively

For the same reasons he challenges the South Dakota Ping Warrant, Mitchell also objects to the magistrate judge's conclusion that the two tracker warrants were supported by probable cause even if the omitted information regarding CI 6 were included. Docket 118 at 15. Mitchell further argues that the tracker affidavits omitted the text messages, which he contends removed additional information related to CI 6's drug dealing. *Id.*

Mitchell's objection is overruled for the same reasons described in Section II.B.1, *supra.* Even though the affidavits omitted the verbatim text messages, the omission does not undermine probable cause. The affidavits summarized the substance of the communications and included other corroborated facts linking Mitchell to fentanyl trafficking, including communications through the (218) phone number controlled by Mitchell and

his associates, surveillance of Mitchell's vehicles and residence, and other investigative details. Docket 92-4 at 3-5; Docket 92-5 at 2-4.

Mitchell argues that excluding the messages removed additional information about CI 6's drug dealing, but the inclusion of such information would not defeat probable cause. Rather, evidence that CI 6 was engaged in fentanyl distribution would place the communications with Mitchell and his associates in the broader context of drug trafficking and would further support the inference that the communications related to ongoing fentanyl sales. But as noted above, the tracker affidavits still contained multiple facts linking Mitchell to fentanyl trafficking, including communications through the (218) phone number linked to Mitchell (and his associates) and surveillance of Mitchell's vehicles and residence. Viewed under the totality of the circumstances, these facts provided a substantial basis for the issuing judicial officer to conclude that there was a fair probability that evidence of drug trafficking would be obtained through the tracker warrants. As such, Mitchell's objection is overruled.

### 3. Exhibit 6 – November 7, 2023, Cell Cite Simulator for Mitchell's Cell Phone

Mitchell objects to the magistrate judge's conclusion that "[w]hen one adds into this affidavit the background information known to SA Pennock about CI 6 but not recited, there is still probable cause." Docket 118 at 16. Mitchell challenges the magistrate judge's conclusion for the same reasons he challenged the South Dakota Ping Warrant. *Id.*

55

For the same reasons noted above, where the court found that the ping warrant affidavit established probable cause above even when including the omitted information, Mitchell's objection here is overruled. *See also* Docket 113 at 50-51.

### 4.    Exhibit 7 – December 19, 2023, Search Warrant for Sioux Falls Storage Unit, Dodge Charger, Suburban, and the Person of Shaun Mitchell

Mitchell objects to the magistrate judge's conclusion that "[a]dding in all the details about CI 6 that were not included in this affidavit . . . does not destroy probable cause. The court concludes that there is ample probable cause supporting the issuance of the search warrant at Ex. 7 even with the information considered." Docket 118 at 16 (quoting Docket 113 at 53). Mitchell challenges this conclusion for the same reasons he challenged the South Dakota Ping Warrant, and further argues that the new facts added to this affidavit were fruit of the poisonous tree. *Id.* Mitchell also objects to the magistrate judge's finding that "SA Pennock did not omit material information about the Wright interview and that even if the omitted information is added back into the affidavit, there was ample probable cause to support issuance of the search warrant." *Id.* (quoting Docket 113 at 54). Mitchell points to the reasons outlined in his post-hearing brief in support of this objection. *Id.*; *see* Docket 111 at 1-2.

After reviewing de novo the affidavit in support of the search warrant for Mitchell's Sioux Falls storage unit, Dodge Charger, Chevy Suburban, and his person, the court finds that the magistrate judge's conclusions are reasonable

56

and properly supported by the facts outlined in the affidavit. Mitchell raises no new arguments here that were not already addressed above or in the magistrate judge's report. *See* Docket 113 at 52-54; Docket 111 at 1-2. Because the court has found that each affidavit at issue established probable cause, the new facts detailed in this affidavit do not constitute fruit of the poisonous tree. Thus, for the reasons detailed above and discussed by the magistrate judge, Mitchell's objection is overruled.

### C.    Whether the subsequent warrants were tainted as fruit of the poisonous tree

Mitchell objects to the magistrate judge's conclusion that none of the subsequent warrants were tainted by fruit of the poisonous tree. Docket 118 at 17. Mitchell relies on the reasoning from his other legal objections, his other pleadings in support of his motion to suppress, and the evidence presented at the *Franks* hearing, arguing that a Fourth Amendment violation occurred and that subsequent warrants are therefore tainted as fruit of the poisonous tree. *Id.* This argument is unavailing.

Because the warrants were supported by probable cause—even assuming the affidavits had included the allegedly omitted information—they cannot logically be considered fruit of the poisonous tree. Mitchell's objection is overruled.

### CONCLUSION

Under *Franks*, a defendant must show deliberate or reckless omission and that the remaining affidavit, if the omitted information was included,

would be insufficient to support probable cause. Mitchell has not met this burden. The affidavits, viewed in their entirety and supported by multiple corroborated sources, provided a substantial basis for the issuing judicial officers to conclude that probable cause existed, and the court must accord substantial deference to that determination. Thus, it is

ORDERED:

1.  That the Report and Recommendation (Docket 113) granting in part and denying in part Mitchell's motion to suppress is adopted as modified and supplemented by this opinion.

2.  That Mitchell's motion to suppress (Docket 88) is denied.

3.  That Mitchell's objections (Docket 118) are sustained in part and denied in part.

Dated March 18, 2026.

BY THE COURT:

/s/ Karen E. Schreier
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE